No. 19-1298

**In the United States Court of Appeals
for the Sixth Circuit**

GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, VIRGINIA CITIZENS
DEFENSE LEAGUE, MATT WATKINS, TIM HARMSEN, RACHEL MALONE,
Plaintiffs-Appellants,

GUN OWNERS OF CALIFORNIA, INC.,
Movant-Appellant,

v.

WILLIAM P. BARR, U.S. Attorney General, in his official capacity as Attorney
General of the United States, U.S. DEPARTMENT OF JUSTICE, BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, THOMAS E. BRANDON, in his
official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms, and
Explosives,
Defendants-Appellees.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN**

**BRIEF FOR APPELLANTS**

KERRY L. MORGAN                           ROBERT J. OLSON*
  PENTIUK, COUVREUR & KOBILJAK, P.C.   JEREMIAH L. MORGAN
  2915 Biddle Avenue, Suite 200         WILLIAM J. OLSON
  Wyandotte, Michigan 48192             HERBERT W. TITUS
  (734) 281-7100                          WILLIAM J. OLSON, P.C.
                                         370 Maple Avenue W., Suite 4
                                         Vienna, Virginia 22180-5615
                                         (703) 356-5070
                              Counsel for Appellants
                              *Attorney of Record

June 24, 2019

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 19-1298          Case Name: Gun Owners of America v. Barr

Name of counsel: Robert J. Olson

Pursuant to 6th Cir. R. 26.1, Gun Owners of America, Inc., et al.
                               *Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ June 24, 2019 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Robert J. Olson
370 Maple Ave. W., Ste. 4
Vienna, VA  22180-5615

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement Concerning Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    CHEVRON DEFERENCE DOES NOT APPLY . . . . . . . . . . . . . . . . . . . 9

      A.    This Court Should Not Apply Chevron Deference . . . . . . . . . . . . . 11

      B.    The Government's Unqualified Waiver of Reliance on
            Chevron Is Controlling Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      C.    The Supreme Court Has Ruled That an Agency
            Interpretation of a Criminal Statute Is Not
            Entitled to "Any Deference" Whatsoever . . . . . . . . . . . . . . . . . . . . 16

II.   THE STATUTE DEFINING THE TERM "MACHINEGUN" IS
      UNAMBIGUOUS, AND DOES NOT INCLUDE BUMP STOCKS . . . . . 22

      A.    The Statutory Term "Automatically" Is Clear and
            Unambiguous, as it Expressly Delineates the Precise
            Boundaries of that Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      B.    The Meaning of "Single Function of the Trigger" Is Clear,
            and Does Not Mean "Single Pull of the Trigger" . . . . . . . . . . . . . . 29

C.  The Statutory Text Does Not Cover Bump Stocks,
    Since They Permit Only One Round to Be Fired
    Per "Function of the Trigger" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.  The District Court Erred by Failing to Expressly Conclude That —
    Much Less Explain How — Bump Stocks Operate
    even by a "Single Pull of the Trigger" . . . . . . . . . . . . . . . . . . . . . . . 33

E.  If the Definition of a Machinegun Is Suddenly Now
    Ambiguous, It Must Be Declared Void for Vagueness. . . . . . . . . . . 35

III.  THE FINAL RULE IS ARBITRARY AND CAPRICIOUS. . . . . . . . . . . . 38

A.  The Final Rule Is Based on the ATF's Unsubstantiated and
    Erroneous Factual Assertions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.  The Final Rule Is Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . 42

    1.  It Was Arbitrary and Capricious for ATF to
        Ban Bump Stocks But Sanction Bump Fire . . . . . . . . . . . . . . 42

    2.  The Final Rule Poses a Threat to Semiautomatic
        Weapons As a Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

IV.  APPELLANTS ALSO MEET THE REMAINING CRITERIA
    FOR A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Certificate of Compliance

Certificate of Service

Addendum

iv

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**

Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**STATUTES**

18 U.S.C. § 926(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
26 U.S.C. § 5845(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
26 U.S.C. § 7805(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
APA Section 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 39

**REGULATIONS**

Final Rule, 83 *Fed. Reg.* 66514 (Dec. 26, 2018) . . . . . . . . . . . . . . . . . . . 2, *passim*

**CASES**

Abramski v. United States, 573 U.S. 169 (2014). . . . . . . . . . . . . . . . . . 16, *passim*
Al-Sarih v. Sessions, 2018 U.S. App. LEXIS 2482 (6th Cir. 2018) . . . . . . . . . . . 9
Aposhian v. Barr, 2019 U.S. Dist. LEXIS 42988
      (D. Utah, March 15, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Atrium Med. Ctr. v. United States HHS, 766 F.3d 560 (6th Cir. 2014) . . 11, 13, 38
Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,
      511 F.3d 535 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
CFTC v. Erskine, 512 F.3d 309 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 15
Christensen v. Harris County, 529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . 31
Connally v. General Constr. Co., 269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . 36
Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . 22
Dig. Realty Trust, Inc. v. Somers, 138 S.Ct. 767 (2018). . . . . . . . . . . . . . . . . . 23
Esquivel-Quintana v. Lynch, 810 F.3d 1019 (6th Cir. 2016) . . . . . . . . . 19, 20, 21
F.J. Vollmer Co. v. Higgins, 23 F.3d 448 (D.C. Cir. 1994). . . . . . . . . . . . . . . . 13
Friedman v. City of Highland Park, 136 S.Ct. 447 (2015) . . . . . . . . . . . . . . . . 52
Global Tel*Link v. FCC, 866 F.3d 397 (D.C. Cir. 2017) . . . . . . . . . . . . . . . . . 15
Guedes v. BATFE, 920 F.3d 1 (D.C. Cir. 2019) . . . . . . . . . . . . . . . . . . 10, *passim*
Gundy v. United States, 2019 U.S. LEXIS 4183 (June 20, 2019). . . . . . . . . 36, 53
Gutierrez-Brizuela v. Lynch, 834 F.3d 1142 (10th Cir. 2016) . . . . . . . . . . . 19, 21
In re Eagle-Picher Industries, Inc., 963 F.2d 855 (6th Cir. 1992) . . . . . . . . . . . . 9

Marbury v. Madison, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

McGirr v. Rehme, 891 F.3d 603 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . 8

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30 (D.D.C. 2000) . . . . . . . . . . . 48

Neustar, Inc. v. FCC, 857 F.3d 886 (D.C. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . 15

Panama Ref. Co. v. Ryan, 293 U.S. 388 (1935). . . . . . . . . . . . . . . . . . . . . . . . . 28

PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., No. 17-1705,
    Slip Opinion (June 20, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Russello v. United States, 464 U.S. 16 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . 44

S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.,
    860 F.3d 844 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sessions v. Dimaya, 138 S.Ct. 1204 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Apel, 571 U.S. 359 (2014). . . . . . . . . . . . . . . . . . . . . 16, *passim*

United States v. Davis, No. 18–431, Slip Opinion (June 24, 2019) . . . . . . . . 5, 36

United States v. Dodson, 519 F. App'x 344 (6th Cir. 2013) . . . . . . . . . . . . . . . 13

United States v. Fleischli, 305 F.3d 643 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . 38

United States v. Garcia, 707 Fed. App'x. 231 (5th Cir. 2017) . . . . . . . . . . . . . . 18

United States v. Gradwell, 243 U.S. 476 (1917) . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Olofson, 563 F.3d 652 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . 38

United States v. TRW Rifle, 447 F.3d 686 (9th Cir. 2006) . . . . . . . . . . . . . . 22, 38

United States v. Williams, 364 F.3d 556 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . 38

Utility Air Regulatory Group v. EPA, 573 U.S. 302 (2014) . . . . . . . . . . . . . . . . 31

Whitman v. United States, 135 S.Ct. 352 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 20

**MISCELLANEOUS**
L. Carroll, Through the Looking Glass (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

S. Duke, "Legality in the Second Circuit," Yale Faculty Scholarship
    Series 817 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

J. Durling & E.G. West, "May *Chevron* Be Waived?" 71 STAN. L.
    REV. ONLINE 183 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A. Gluck & R. Posner, "Statutory Interpretation on the Bench:
    A Survey of Forty-Two Judges on the Federal Courts of
    Appeals," 131 HARV. L. REV. 1298 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D. Kelley, The Art of Reasoning: An Introduction to Logic & Critical Thinking
    (W.W. Norton & Company; Fourth Ed. (Oct. 2013)) . . . . . . . . . . . . . . . . . 47

R. Kethledge, <u>Ambiguities and Agency Cases</u>, 70 Vand. L. Rev.
     En Banc 315 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
A. Scalia and B. Garner, <u>Reading Law</u> (West Publishing: 2012). . . . 25, 28, 31, 52
"Waiving Chevron Deference," 132 Harv. L. Rev. 1520, 1525
     (Mar. 8, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATEMENT CONCERNING ORAL ARGUMENT**

Appellants request oral argument because this case involves important questions regarding the regulatory expansion of a Congressional statute by the Executive Branch, enlarging the federal ban on "machineguns" beyond the unambiguous statutory language. Accordingly, this case involves separation of powers issues and the improper application of <u>Chevron</u> deference to administrative regulations, the violation of which results in criminal penalties, and Appellants believe oral argument would assist this Court in resolving these significant issues.

## JURISDICTIONAL STATEMENT

Appellants seek review of the district court's March 21, 2019 order denying their motion for a preliminary injunction. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Appellants filed their notice of appeal timely on March 22, 2019.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in applying <u>Chevron</u> deference to the ATF's Final Rule banning bump stocks.

2. Whether the ATF's regulatory expansion of the statutory ban on machineguns, to apply to bump stocks, is arbitrary and capricious.

3. Whether the federal statute defining a "machinegun" is unambiguous, and does not apply to bump stocks.

4. Whether the district court improperly denied Appellants' motion for preliminary injunction.

## STATEMENT OF THE CASE

This case involves a challenge by Gun Owners of America, *et al.* ("Appellants") to the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF"), *et al.* ("Appellees") Final Rule reclassifying so-called "bump fire stocks" as machineguns, banning their private possession, and ordering their destruction.

83 *Fed. Reg.* 66514 (Dec. 26, 2018).  The Final Rule went into effect on March 26, 2019.  By that date, law-abiding gun owners were ordered to destroy or surrender over a half million lawfully owned bump stocks, valued at over $100 million.  Anyone who did not comply now faces felony prosecution.

In reclassifying bump stocks as machineguns, the Final Rule reverses over a decade of repeated ATF legal classifications of bump stocks as mere firearm accessories, entirely unregulated by federal law.  The Final Rule also provides an entirely new explanation of how bump stocks operate, conflicting with no fewer than a dozen past agency classification letters.

A bump stock is a plastic stock that replaces the traditional stock on a semi-automatic rifle such as an AR-15.  On an AR-15, the bump stocks slides freely over the rifle's buffer tube, as opposed to a traditional stock which is rigid and unmoving.  The bump stock has a protruding piece of plastic known as the "extension ledge," which provides a place where the shooter's "trigger finger ... is stabilized."  Opinion and Order Denying Plaintiffs' Motion for a Preliminary Injunction ("Opinion"), R.48, Page ID#459.  As such, the shooter's finger rests on the extension ledge of the bump stock, not the firearm's trigger.  The shooter maintains his finger on the extension ledge of the stock and places his support hand on the foregrip of the rifle.

To bump fire a rifle with a bump stock, the shooter pushes the freely sliding firearm forward with his non-trigger hand, until the firearm's trigger comes into contact and is depressed by the trigger finger (which is resting on the extension ledge of the bump stock). Discharging a shot, the recoiling firearm counteracts the shooter's forward pressure, and moves the firearm rearward, away from the shooter's trigger finger (which is still resting on the extension ledge). This physical separation between the trigger finger and trigger allows the trigger to "reset," readying it for another shot.

Meanwhile, the shooter's arms and shoulders absorb the recoil from the fired shot, and the shooter's forward pressure on the firearm again pushes the firearm forward, again contacting the trigger with the trigger finger. This process continues by "bumping" a shooter's finger on and off the trigger. For the rifle to fire in a rapid (but semiautomatic) manner, the shooter must properly absorb the recoil and adjust and apply the appropriate amount of forward pressure for each and every shot. Bump stocks did not give rise to bump fire. Rather, bump fire has existed as long as the semi-automatic rifles that are bump fired. Bump stocks simply make the bump fire technique easier and safer.

Appellants are gun rights organizations and individual persons, who brought suit to challenge the Final Rule. Appellees are federal government

entities responsible for promulgating and enforcing the Final Rule. Appellants' suit was brought on December 26, 2018, the same day as publication of the Final Rule in the Federal Register. Complaint, R. 1. Along with their complaint, Appellants sought a preliminary injunction from the district court. Plaintiffs' Motion for a Preliminary Injunction, R. 9. Although both parties agreed to expedited consideration of Appellants' motion, the district court refused to schedule oral argument on the matter until March 6, 2019. On March 19, one only week before the Final Rule took effect, Appellants sought a writ of mandamus from this Court (No. 19-1268), having received no ruling on their motion in the district court. Emergency Petition for a Writ of Mandamus, 19-1268, Doc. 2. On March 21, 2019, the district court issued its opinion, denying Appellants' motion. Opinion, R. 48. The same day, Appellants filed their notice of appeal, along with an emergency motion in this Court, asking for a stay of the Final Rule until this Court could consider Appellants' appeal. Emergency Motion for a Stay of Agency Action, 19-1298, Doc. 6. A three-judge motions panel of this Court denied that motion on March 25, 2019, and the Final Rule took effect the next day. Order, 19-1298, Doc. 9-2. The U.S. Supreme Court declined to provide relief. 139 S.Ct. 1406 (Mar. 28, 2019). This appeal followed.

## SUMMARY OF ARGUMENT

Both parties agree that <u>Chevron</u> deference is inapplicable in this case. Because violation of the law at issue carries criminal penalties, it is the duty of the courts to decide what the statute actually means, not merely whether ATF's interpretation falls somewhere on a vague spectrum of "reasonableness." The Constitution simply does not permit bureaucrats to "say what the law is." Nevertheless, the court below permitted just that.

First, the government does not purport to transform bump stocks into newly-minted machineguns, but instead alleges that bump stocks have always been machineguns under the law, and ATF's past classification letters simply got it wrong. Thus, because the Final Rule is interpretive rather than legislative, it deserves no deference. If it were otherwise — if bump stocks were not machineguns until the agency declared it — then ATF is guilty of a gross usurpation of the legislative power. As Justice Gorsuch wrote in an opinion for the Court issued just today, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." <u>United States</u> v. <u>Davis</u>, No. 18-431, Slip Op. at 1 (June 24, 2019). Second, the ATF is due no deference in this case, because the government has made an express and unqualified waiver of the <u>Chevron</u> doctrine, which virtually every commentator

5

and court agrees that it can do.  Indeed, this Court has held as much.  Third, *recent* Supreme Court decisions in <u>Apel</u> and <u>Abramski</u> make it clear that the government is not due "any deference" at all when interpreting the criminal law.  The district court failed to address this issue.

Next, regardless of whether <u>Chevron</u> applies here, the statute at issue is unambiguous, and it does not apply to bump stocks.  The government has found itself in quite a pickle on this issue, at various times admitting the statute is unambiguous, to avoid jeopardizing past criminal convictions and put the law at risk of being declared void for vagueness.  Yet at other times, the government has alleged that the statute is ambiguous as applied to bump stocks, recognizing that it cannot win if the statute is interpreted as clearly written.  Apparently, the Final Rule both creates and resolves ambiguity.  The government asks the Court to simply look the other way on this one.

Admitting that the statute — as written — does not apply to bump stocks, the government seeks the courts' permission to "expand" and "revise" the statute. Arguing that Congress intended to regulate not just machineguns, but any weapon that fires rapidly, the government rewrites the statutory phrase "single function of the trigger" to be "single pull of the trigger."  Yet the statutory term "function" clearly refers to mechanical movement of the trigger, while "pull" refers to the

biological action by the shooter. To replace "pull" with "function" changes the meaning of the statute, as the government readily admits. But as the Supreme Court has made clear, it is in no way an "interpretation" to simply excise a disfavored term from a statute and replace it with one that is preferred. Finally, as an ironic icing on the cake, even adopting ATF's phrase "single pull of the trigger" does not save the government's case, since bump stocks operate through a series of independent trigger pulls.

Nor is the term "automatically" in the statute subject to open ended interpretation. Rather, "automatically" it is expressly limited by the phrase "by a single function of the trigger," and a bump stock requires a "single function of the trigger" for each round that is fired.

Next, even with <u>Chevron</u> deference, the Final Rule is still arbitrary and capricious — based not only on a new interpretation of the law, but also a new recitation of the facts. Indeed, the government now claims that bump stocks function differently than they did a decade ago.

The Final Rule is also arbitrary and capricious in its prohibition of bump fire with bump stocks and corresponding sanctioning of bump fire with rubber bands. Indeed, rubber bands meet each of the elements created by the Final Rule,

while bump stocks meet none of them. Likewise, the entire class of semiautomatic weapons better fit ATF's absurd new classification than do bump stocks.

Finally, Appellants meet the other elements for a preliminary injunction, as hundreds of thousands of Americans have suffered and are suffering irreparable financial loss and other harm, based on no more than a vague theory of how bump stocks might pose a threat to public safety.

## ARGUMENT

According to the law of this Circuit, the Court reviews appeals from a denial of a preliminary injunction as follows:

> We generally review a district court's denial of a request for a preliminary injunction for abuse of discretion. Under this standard, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." **The district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*.** However, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. [Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 540-41 (6th Cir. 2007) (citations omitted) (emphasis added).[1]]

---

[1] *See also* McGirr v. Rehme, 891 F.3d 603, 610 (6th Cir. 2018).

The four elements for a preliminary injunction are: "(1) the likelihood of the plaintiff's success on the merits, (2) whether plaintiff will suffer irreparable injury without the injunction, (3) the harm to others which will occur if the injunction is granted, and (4) whether the injunction would serve the public interest." In re Eagle-Picher Industries, Inc., 963 F.2d 855, 858 (6th Cir. 1992). In this Circuit, "these are factors to be balanced, not prerequisites to be met." S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co., 860 F.3d 844, 849 (6th Cir. 2017). Additionally, "[t]he final two factors, harm to others and the public interest, 'merge when the Government is the opposing party.'" Al-Sarih v. Sessions, 2018 U.S. App. LEXIS 2482, *4 (6th Cir. 2018). Each of these four factors weighs heavily in Appellants' favor here.

Sections I-III address the first element of a preliminary injunction, the likelihood of success on the merits, where the standard of review is *de novo*. Section IV addresses the district court's consideration of the other three elements.

## I.    <u>CHEVRON</u> DEFERENCE DOES NOT APPLY.

As the district court noted, neither of the parties fully briefed or argued the issue of <u>Chevron</u> deference below. *See* Opinion, R.48, Page ID#461. And for good reason: counsel for both parties argued that <u>Chevron</u> deference was inapplicable. *See* Transcript, R.56, Page ID#500, 520. Rather, when interpreting

9

a criminal statute, ultimately it is the responsibility of the judicial branch — not

executive branch bureaucrats — to determine what a statute means.[2]  Nevertheless,

the district court decided that <u>Chevron</u> deference must apply, that the meaning of

the 1934 statute is now ambiguous, and that the agency's rulemaking was

reasonable.  The district court erred at each step.[3]

As the D.C. Circuit has noted, "'Legislative rules generally receive *Chevron*

deference,' whereas 'interpretive rules enjoy no *Chevron* status as a class.'"

<u>Guedes</u> at 17.  The district court concluded that the Final Rule is of the first type

because (i) "Congress has delegated the authority to administer and enforce the

statutes to the Attorney General," (ii) the agency relied on that delegation here,

---

[2]  Below, the government agreed that "[t]he Court needs to be persuaded that that position is correct and not simply defer to [the agency's interpretation] as one permissible interpretation among many."  Transcript, R.56, Page ID#521.  *See* <u>Guedes</u> v. <u>BATFE</u>, 920 F.3d 1, 42 (D.C. Cir. 2019) (Judge Henderson calling this "'the old-fashioned' route....").

[3]  Alternatively, this Court should decline to apply <u>Chevron</u> here because, notwithstanding **any** court opinion to the contrary, giving <u>Chevron</u> deference to the Final Rule would be an abdication of the courts' duty to "say what the law is," (<u>Marbury</u> v. <u>Madison</u>, 5 U.S. 137, 177 (1803)) and would violate the separation of powers principles embodied in our federal constitution.  *See* R. Kethledge, <u>Ambiguities and Agency Cases</u>, 70 VAND. L. REV. EN BANC 315, 324 (2017).

and (iii) "[t]he use of formal rulemaking procedures further suggests the Court should apply the *Chevron* analysis."  Opinion, R.48, Page ID#462-463.[4]

First, the lower court was wrong in concluding that the Final Rule is a legislative rule and that the <u>Chevron</u> framework applies.  Second, the court improperly rejected the issue raised by Appellants as to whether the government can disclaim or waive application of the <u>Chevron</u> doctrine.  Third, the court failed to acknowledge — much less attempt to navigate — the minefield of problems created when executive branch agencies are given *carte-blanche* to criminalize conduct by unilaterally transforming lawful items into contraband.

### A.    This Court Should Not Apply <u>Chevron</u> Deference.

The district court erred in finding that <u>Chevron</u> deference is warranted here.  Citing <u>Atrium Med. Ctr.</u> v. <u>United States HHS</u>, 766 F.3d 560, 566 (6th Cir. 2014), the district court first concluded that "[t]he statutory scheme suggests that

---

[4]  The D.C. Circuit cited an additional factor, namely the Final Rule's language that bump stocks "**will be** prohibited when this rule becomes effective" and that the Final Rule criminalizes "only **future conduct**...."  83 *Fed. Reg.* 246 at 66514, 66525 (emphasis added); <u>Guedes</u> at 18.  The D.C. panel rejected the government's position that bump stocks have always been machineguns, and that "the [Final] Rule's effective date ... merely mark[s] the end of a period of discretionary withholding of enforcement."  <u>Guedes</u> at 20.  Nevertheless, below, the government argued that "this is not a case where what we are ... say[ing]... these are not machineguns [but] they are now machineguns."  Transcript, R.56, Page ID#521.

Congress intended the ATF speak with the force of law," because "Congress has delegated the authority to administer and enforce the statutes [through] necessary rules and regulations." Opinion, R.48, Page ID#462. The district court also noted that ATF relied on that implied authority here, and that "use of formal rulemaking procedures further suggests the Court should apply the *Chevron* analysis." Opinion, R.48, Page ID#463.

Certainly, the Gun Control Act and the National Firearms Act delegate limited authority to ATF to issue regulations which administer the statute Congress enacted. *See* 18 U.S.C. § 926(a), 26 U.S.C. § 7805(a). But ATF cannot simply rely on either general grants of authority or implied power as providing specific authority to expand the scope of a statute. Congress's general grants of authority for ATF to do things like create forms and inspect dealers do not demonstrate a legislative intent that ATF "speak with the force of law" as to what constitutes a "machinegun."

Indeed, if the D.C. panel is correct that bump stocks were not machineguns **until** ATF decided so (*i.e.*, a legislative rule) (Guedes at 18-19), then that means **an executive branch agency — not Congress — criminalized possession of bump stocks**. That conclusion would be constitutionally untenable. However, if the Final Rule merely "'advis[es] the public of the agency's construction of the

statutes and rules which it administers,'" then it "lacks 'the force and effect of law.'" <u>PDR Network, LLC</u> v. <u>Carlton & Harris Chiropractic, Inc.</u>, Supreme Court Docket No. 17-1705, Slip Op. at 2 (June 20, 2019). And if that is the case, it is up to this Court to determine the objectively correct interpretation (not just whether ATF's interpretation is subjectively reasonable). Indeed, as this Court has noted, "[t]he [agency's] interpretation merits less deference if the agency's action ... was simply another kind of 'interpretive choice' that an agency must 'necessarily make' when applying a statute." <u>Atrium Med. Ctr.</u> at 566-67.[5]

The Final Rule does not deal with an area within the scope of executive power. Nor does it merely administer a statute — rather, by its own admission, it opines upon the meaning of the statute. That is an inherently judicial — not executive — function.

---

[5] The Final Rule refers to two cases that ATF claims provides it the authority for the Final Rule. 83 *Fed. Reg.* at 66515. Yet those cases (<u>United States</u> v. <u>Dodson</u>, 519 F. App'x 344 (6th Cir. 2013) and <u>F.J. Vollmer Co.</u> v. <u>Higgins</u>, 23 F.3d 448 (D.C. Cir. 1994)) involve situations where the agency was applying an unambiguous statute to classify a given item. Here, the agency is attempting to change its "interpretation" of a statute, and then apply that changed "interpretation" to re-classify an item.

**B.** **The Government's Unqualified Waiver of Reliance on <u>Chevron</u> Is Controlling Here.**

In the court below, the government expressly disclaimed reliance on <u>Chevron</u>. *See* Notice of Supplemental Authority, R.38, Page ID#302. And, although Appellants' counsel brought this waiver to the Court's attention during oral argument (*see* Transcript, R.56, Page ID#498), the district court gave no indication it considered the issue of waiver.[6] Thus, the question whether <u>Chevron</u> can be waived remains unresolved.

As commentators have pointed out, "[t]he Supreme Court has never addressed whether *Chevron* deference can be waived." "Waiving Chevron Deference," 132 HARV. L. REV. 1520, 1525 (Mar. 8, 2019). Yet the answer from the Supreme Court would appear to be that <u>Chevron</u> can be waived. *Id.* at n.40. Indeed, "[m]ost federal courts (as well as scholars) have assumed that ... agencies can waive *Chevron* deference." J. Durling & E.G. West, "May *Chevron* Be Waived?" 71 STAN. L. REV. ONLINE 183, 185 (2019).

---

[6] As the D.C. Circuit concluded, "[t]o the extent *Chevron* treatment can be waived, we assume that the government's posture in this litigation would amount to a waiver...." <u>Guedes</u> at 21. *See also* Opinion, R.48, Page ID#461-462 ("Defendants have explicitly stated that they do not contend that this Court should apply *Chevron* deference....").

14

The law in this Circuit seems clear that an agency can waive reliance on the Chevron framework. The D.C. Circuit concluded otherwise,[7] but that court's love affair with Chevron is no secret, and this Court should decline the invitation to "dr[ink] the *Chevron* Kool-Aid."[8] Indeed, in CFTC v. Erskine, 512 F.3d 309 (6th Cir. 2008), this Court held that the agency "waived any reliance on *Chevron* deference by failing to raise it to the district court." *Id.* at 314. If an agency can forfeit reliance on the Chevron framework by failing to raise it, it would seem logical that it could make a knowing and intelligent waiver.

---

[7] The D.C. Circuit panel concluded that Chevron deference could not be waived in this case. Yet "[t]he D.C. Circuit has ... issued conflicting decisions on the issue," which "arguably creates an intra-circuit split...." "May *Chevron* Be Waived?" at 183, 186. In its bump stock opinion, the D.C. Circuit panel claimed that "our court has yet to address whether ... agency counsel could ... opt to effect a waiver of *Chevron* treatment [for] a rule that would otherwise plainly occasion the application of *Chevron*...." Guedes at 21. Phrasing the question in this cramped way, the Circuit circumvented other holdings that "[c]onsequently, [the agency] has forfeited any claims to *Chevron* deference.... (*Chevron* deference is not jurisdictional and can be forfeited)." Neustar, Inc. v. FCC, 857 F.3d 886, 894 (D.C. Cir. 2017). *See also* Global Tel*Link v. FCC, 866 F.3d 397, 408 (D.C. Cir. 2017) ("it would make no sense for this court to determine whether the disputed agency positions ... warrant *Chevron* deference when the agency has abandoned those positions ... '[w]ith *Chevron* inapplicable ... "we must decide for ourselves the best reading"' of the statut[e].").

[8] Abbe R. Gluck & Richard A. Posner, "Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals," Harv. L.R. 1298.

In this case, the government has expressly disclaimed reliance on the

Chevron framework, and Appellants have argued to the district court that this

waiver meant that the district court should not apply Chevron deference. Based on

the clear law of this Circuit, the district court erred by applying Chevron in the

face of the government's express waiver.

### C. The Supreme Court Has Ruled That an Agency Interpretation of a Criminal Statute Is Not Entitled to "Any Deference" Whatsoever.

In United States v. Apel, 571 U.S. 359 (2014), the Supreme Court made

clear that "we have never held that the Government's reading of a criminal statute

is entitled to any deference." *Id.* at 369. In Abramski v. United States, 573 U.S.

169 (2014), the Supreme Court noted that "[t]he critical point is that criminal laws

are for courts, not for the Government, to construe.... We think ATF's old position

no more relevant than its current one — which is to say, not relevant at all.

Whether the Government interprets a criminal statute too broadly (as it sometimes

does) or too narrowly.... a court has an obligation to correct its error." *Id.* at 191.

Further, Apel's reference to "any deference" is not limited to Chevron

deference, but also denies to the government any deference afforded under the

APA Section 706(a), since the standards are identical. Transcript, R.56, Page

ID#499-500. The district court, however, did not address these issues in its

opinion. There is no reference to Apel, Abramski, or the appropriate level of deference due to agency interpretations of criminal statutes.

The D.C. Circuit's bump stocks opinion, however, did take on the issue. There, the panel began by noting that the Supreme Court in the past has applied Chevron deference to statutes containing criminal penalties. Guedes at 23-24. However, the cases the panel cited are from 1984, 1991, 1995, and 1997— the heyday of the Court's Chevron jurisprudence, long before Apel and Abramski were decided. Although acknowledging that, in recent years, "the Supreme Court has signaled some wariness about deferring to the government's interpretations of criminal statutes," the panel nevertheless discounted Apel and Abramski, claiming that "those statements were made outside the context of a *Chevron*-eligible interpretation...."[9] *Id.* at 25.

Yet even if, as the D.C. Circuit claims, Abramski and Apel were in some way distinguishable because they did not involve agency interpretations holding "the force of law," the D.C. Circuit is, at best, splitting hairs. It is a mistake to

---

[9] Actually, the D.C. Circuit was factually wrong on this point because, in Abramski, there was **not only** an "informal guidance document" (an ATF Industry Circular) at issue, **but also** the ATF Form 4473, which for years had taken a position contrary to the agency's current position — and changes to the Form 4473 **are** promulgated pursuant to the formal rulemaking process, and published in the Federal Register. *See, e.g.*, 79 *Fed. Reg.* 45091.

dismiss Apel and Abramski as irrelevant here.  In those cases, the Court spoke

with strong language — agencies are not due "any deference" when they interpret

criminal statutes.  After all, "criminal laws are for courts, not for the Government,

to construe."  Abramski at 191.  The Supreme Court has given no indication that

separation of powers concerns change depending on whether an agency interprets

a statute informally, or after notice and comment rulemaking.  The concern is not

how careful the agency has been, but rather who is wielding judicial power.

   While the D.C. Circuit relies on cases decided in the 1990's, Apel and

Abramski represent the Supreme Court's most recent pronouncements in this area

that is continually evolving further away from agency deference and towards

exclusive judicial review.  *See* Judge Henderson's dissent in Guedes at 40-41 ("I

am not convinced that my colleagues' reading of *Babbitt* as the last word on this

topic is correct....  The Supreme Court's most recent decisions indicate ... that

*Chevron* review does not apply to a statute/rule with criminal sanctions.").

   The Fifth Circuit agrees, recognizing that "[t]he Supreme Court has now

resolved this uncertainty, instructing that **no deference** is owed to agency

interpretations of criminal statutes....  Following the Supreme Court's instruction

... we decline to show deference to the ATF regulation...."  United States v. Garcia,

707 Fed. Appx. 231, 234 (5th Cir. 2017) (emphasis added).  Likewise, Judge

Henderson, dissenting from the Guedes opinion, cited then-Judge Gorsuch's concurring opinion on this issue in Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1155 (10th Cir. 2016) (Gorsuch, J., concurring), where he observes that "[t]he Supreme Court has expressly instructed us *not* to apply *Chevron* deference when an agency seeks to interpret a criminal statute." As the district court correctly noted, this Court "recently described the status of *Chevron* as 'already-questionable' ... and noted that '[m]any members of the Supreme Court have called *Chevron* into question.'" Opinion, R.48, Page ID#461.

In Esquivel-Quintana v. Lynch, 810 F.3d 1019 (6th Cir. 2016) (overruled on other grounds), a three-judge panel of this Court wrestled with the issue of whether deference still applies "to agency interpretations of ambiguous laws with criminal applications" (*id.* at 1023) after Apel and Abramski, but the opinion is more descriptive than prescriptive. There, the panel majority noted "[a]n increasingly emergent view asserts that the rule of lenity ought to apply in civil cases involving statutes that have both civil and criminal applications." *Id.* at 1023. Noting the same concern shared by the district court (*see* Transcript, R.56, Page ID#498-99), the panel observed that "statutory terms should not have different meanings in different cases," and the "separation of powers [principle] ensuring that legislatures, not executive officers, define crimes." *Id.* To do

19

otherwise, the panel noted, "would allow agencies to 'create (and uncreate) new crimes at will,'" which "**threatens a complete undermining of the Constitution's separation of powers**."[10] *Id.* at 1023-24 (emphasis added). Nevertheless, after reciting these serious constitutional concerns, the panel reached the conclusion (arguably limited to the facts of that case), that "we must follow *Chevron* in cases involving the Board's interpretations **of immigration laws**." *Id.* at 1024 (emphasis added).

Dissenting in part, Judge Sutton made clear that "*Chevron* has no role to play in construing *criminal* statutes." <u>Lynch</u> at 1027 (Sutton, J., dissenting). Indeed, ATF did not just "fill a gap." It blatantly rewrote clear statutory language to cover a firearm accessory that the agency admits is not covered by the existing text. In other words, "the King ... create[d] an[] offence ... which was not an offence before...." <u>Whitman</u> at 353 (Scalia, J., dissenting). As relevant here, Judge Sutton noted "'if Congress wants to assign responsibility for crime

---

[10] *See also* <u>Whitman</u> v. <u>United States</u>, 135 S. Ct. 352, 352-54 (2014) (Scalia, J., statement respecting denial of certiorari) ("I doubt the Government's pretensions to deference. They collide with the norm that **legislatures, not executive officers, define crimes**. When King James I tried to create new crimes by royal command, the judges responded that 'the King cannot create any offence by his prohibition or proclamation, which was not an offence before.' ... James I, however, did not have the benefit of *Chevron* deference [where] federal administrators can in effect create (and uncreate) new crimes at will.... ") (emphasis added).

definition to the executive, it must speak clearly.'" <u>Lynch</u> at 1030.  Thus, Judge

Sutton expressed confusion with the panel majority's conclusion that "even

though the rule of lenity ought to control here, we must defer to the government's

position under <u>Chevron</u> all the same." *Id.* at 1030.

In <u>Gutierrez-Brizuela</u> v. <u>Lynch</u>, then-Judge Gorsuch noted that <u>Chevron</u>:

> invites the very sort of due process (fair notice) and equal protection
> concerns the framers knew would arise if the political branches
> intruded on judicial functions.  Under *Chevron* the people aren't just
> charged with awareness of ... the law [but] with an awareness of
> *Chevron*; required to guess whether the statute will be declared
> 'ambiguous' ... and required to guess (again) whether an agency's
> interpretation will be deemed 'reasonable.' ...  And ... they must
> always remain alert to the possibility that the agency will reverse its
> current view 180 degrees anytime based merely on the shift of
> political winds and *still* prevail.  [*Id.* at 1152.]

It is almost as if then-Judge Gorsuch had this case in mind when he penned those

words.

Since <u>Chevron</u> does not apply in this case, it was up to the district court to

determine — for itself — what the statute means, and whether it covers bump

stocks.  The district court's failure to undertake this inquiry constitutes plain error.

21

## II. THE STATUTE DEFINING THE TERM "MACHINEGUN" IS UNAMBIGUOUS, AND DOES NOT INCLUDE BUMP STOCKS.

Appellants have repeatedly argued that the statutory text is clear, unambiguous, and does not include bump stocks.[11]  Interestingly enough, the government agrees,[12] noting only that the statute does not "clearly exclude[] bump stocks" — as if any statute would.  Brief in Opposition, R.34, Page ID#266. Nevertheless, the government claimed a need to administratively "expand"[13] and "revis[e]"[14] the statute,[15] so that it can then be applied to bump stocks, in order to fulfill a political agenda.  *See* Reply, R.37, Page ID#287-88.  Appellees claim that "once definitions ... have been provided" —  but apparently not until then — "the

---

[11]  *See* U.S. v. TRW Rifle, 447 F.3d 686, 689 n.4 (9th Cir. 2006).

[12]  *See* Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Brief in Opposition"), R.34, Page ID#255; Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction ("Reply"), R.37, Page ID#286.  *See also* 83 *Fed. Reg.* 66527; Brief for Appellees in Guedes v. ATF, 19-5042, Doc. # 1777426 (D.C. Cir.) at 37.  The government never contested this allegation, and has since failed to dispute that it conceded the issue.  *See, e.g.*, Emergency Petition for a Writ of Mandamus in Docket No. 19-1268 at 11.

[13]  Guedes Opposition at 10.

[14]  Codrea v. ATF, Memorandum of Points and Authorities in Opposition, No. 18-3086 (D.D.C.) Doc. # 16 at 4.

[15]  *See* Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last:  'judicial inquiry is complete.'").

22

statute is reasonably interpreted to include bump stocks...." Brief in Opposition, R.34, Page ID#255.

According to the government's own admission, "[a]bsent the revised definition, ATF could not restrict bump stocks." Guedes v. ATF, USDC-DC, No. 18-2988, ECF #16 at 33. Yet agencies do not have authority to "revise" statutes.[16] Appellants should prevail on that basis alone. Recognizing that it could not sanction the agency's rather candid admission that it has usurped congressional power and rewritten the law, the court below instead concluded the law to be ambiguous (Opinion, R.48, Page ID#463-64) — thereby permitting the court to defer to the agency's new "interpretation" of the law Congress enacted. To be sure, the district court's approach is slightly less violative of the constitutional separation of powers, but only mildly. This Court should not follow suit.

A.    **The Statutory Term "Automatically" Is Clear and Unambiguous, and the Statute Expressly Delineates the Precise Boundaries of that Term.**

A shooter using a bump stock must apply both forward pressure to the rifle, and rearward pressure on the bump stock, in order both to begin and to maintain a sequence of bump fire. *See* Opinion, R.48, Page ID#459; Verified Declaration of

---

[16] *See* Dig. Realty Trust, Inc. v. Somers, 138 S.Ct. 767, 782 (2018) ("[t]he statute's unambiguous ... definition ... precludes the [agency] from more expansively interpreting that term.").

Richard (Rick) Vasquez, R.7, Page ID#149. This **necessary** application of pressure by the shooter — which the government has conceded to be an "element of added input" (Reply, R.37, Page ID#295) — means that a bump stock does not operate "automatically," or "'by itself with little or no direct human control.'" Opinion, R.48, Page ID#464.

Thus, the district court described the issue as "whether the forward pressure[17] exerted by the shooter using the non-trigger hand requires the conclusion that a bump stock does not shoot automatically."[18] *Id.* In the D.C. case, Judge Friedrich similarly asked — "how much manual input is too much...." Guedes at 33. Likewise, the government claimed the issue "is one of degree: how

---

[17] In the past, ATF described this forward pressure as "**continuous multiple inputs** by the user for **each** successive shot." Exhibit 20, R.1-21, Page ID#79-80 (emphasis added). That description hardly sounds "automatic" in any sense of the word. Rather, it sounds like intimate involvement by the shooter.

[18] ATF gave **three factors** which the agency argued means a bump stock operates automatically. Response, R.34, Page ID#261. However, with respect to the first factor, the government has claimed that the extension ledge is both **necessary** for automatic fire, but **irrelevant** to its classification. *See* Reply, R.37, Page ID#296-97. And with respect to the second factor, the government and court below admitted the shooter's finger and the firearm's trigger are separated between shots (*see* Opinion, R.48, Page ID#459), meaning it is physically impossible to have "**constant** rearward pressure on the trigger." Indeed, the trigger and the extension ledge are alternately articulating towards and away from each other.

24

much human intervention is necessary to render a bump stock 'manual' rather than 'automatic.'"  Brief in Opposition, R.34, Page ID#271.

Yet the question is decidedly **not** "one of degree."  It is not up to agencies — or the courts — to decide how much human input (or mechanical function) is too much, and thus render a firearm not a machinegun.  Rather, Congress has explicitly and carefully provided the boundaries of the term "automatically" in the statute, a definition that has stood the test of time.  *See* Reply, R.37, Page ID#296. A machinegun is one that "shoots automatically more than one shot, without manual reloading, **by a single function of the trigger**."  26 U.S.C. § 5845(b) (emphasis added).  As Appellants have explained, a "single function of the trigger" is critical limiting language for "automatically," representing the starting and the ending point of just how much input is allowable.[19]  As Judge Henderson

---

[19]  The D.C. Circuit claimed that "by a single function of the trigger" does not necessarily mean "by *only* a single function of the trigger," but instead could mean "by a single function of the trigger" plus "some further degree of manual input."  Guedes at 31.  This understanding usurps the legislative power to define boundaries in the statute, and transfers it to judges to decide what is "too much" or goes "too far."  The D.C. panel's approach likely would appeal to Humpty Dumpty, who said "[w]hen *I* use a word ... it means just what I choose it to mean—neither more nor less.... The question is ... which is to be master—that's all."  L. Carroll, Through the Looking Glass (1871).  *Cf.* A. Scalia and B. Garner, Reading Law, p. 93 (West Publishing:  2012) ("Nothing is to be added to what the text states or reasonably implies ... a matter not covered is to be treated as not covered.").  Also, *expressio unius est exclusio alterius.*

wrote in dissent in the D.C. opinion, "[t]he statute specifies a single function; the Rule specifies a single function *plus*." Guedes at 35.

Rejecting Appellants' argument, the district court erroneously decided that "[t]he statute is ambiguous as to whether the word 'automatically' precludes any and all application of non-trigger, manual forces...." Opinion, R.48, Page ID#465. The district court is wrong. The statute is not ambiguous and, in order to conclude that "non-trigger, manual forces" are permissible, it was necessary for the district court to read the statutory limitation "by a single function of the trigger" completely out of the statute. The court did so in three steps.

First, the district court correctly noted that "'automatically' functions as an adverb modifying the verb 'shoots.'" *Id.*, Page ID#464. Yet what the court failed to acknowledge is that the phrases "without manual reloading" and "by a single function of the trigger" are adverbial phrases which impose further limitations.[20]

---

[20] Diagraming the sentence would look like this:



(Judge Henderson's dissent includes a similar diagram in Guedes at 44 n.13).

To stop reading after "automatically" would be to miss the meaning of the statute; the definition of machinegun is not limited simply to automatic shooting, but to automatic shooting that occurs **without** manual reloading and **by** a single function of the trigger. *See* Judge Henderson's dissent in <u>Guedes</u> at 43.

Second, the district court claimed that "[r]ead in context, a weapon is a machine gun when more than one shot occurs **without manual reloading**. Putting forward pressure on the barrel with the non-trigger hand is **not manual reloading**." Opinion, R.48, Page ID#465 (emphasis added). In focusing only on the limitation "without manual reloading," the court ignored the rest of the "context" — the additional limitation "by a single function of the trigger."

Third, if there was any doubt left as to how the district court misread the statute, the court claimed that "**the word** 'automatically' ... is ambiguous," and phrased the issue to be "whether **the word** 'automatically' precludes any and all application of non-trigger, manual forces...." Opinion, R.48, Page ID#464-65 (emphasis added).[21] Likewise, the D.C. Circuit excised "the term 'automatically'" from the statute, claiming its meaning was ambiguous when standing on its own. <u>Guedes</u> at 30.

---

[21] Compare that to the lower court's analysis of "**the phrase** 'single function of the trigger.'" Opinion, R.48, Page ID#465 (emphasis added).

The single word "automatically" is ambiguous when isolated by itself, but that is not how statutes are interpreted. A refrigerator operates "automatically," but that does not make it a machinegun. Congress used **many words** to define a machinegun, including the phrase "by a single function of the trigger." Indeed, it is many individual words — each capable of multiple interpretations out of context — that together provide unambiguous meaning.[22] If it were not so, no statute would have any fixed meaning.[23] The district court clearly erred when it pulled the word "automatically" from the statute, as if Congress left it entirely unmodified.

_____

[22] As Justice Cardozo once explained, "the meaning of a statute is to be looked for, not in any single section [or word], but in all the parts together...." Panama Ref. Co. v. Ryan, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting). *See also* Reading Law at 167.

[23] The district court's error is further exposed if one hypothetically were to read the other limiting phrase "without manual reloading" out of the statute, which would permit ATF to conclude that an Ithaca Model 37 pump action shotgun is a machinegun, because the shotgun "permits a shooter to pull the trigger, hold it back, and pump the fore-end." *See* Final Rule, 83 *Fed. Reg.* 66534. But presumably no one would agree with that absurd conclusion, since a pump shotgun requires each round be manually loaded. Likewise, both parties agree that a bump stock fires only one round for ever "single function of the trigger." Only by ignoring (or rewriting) that phrase can the government prevail.

**B.      The Meaning of "Single Function of the Trigger" Is Clear, and Does Not Mean "Single Pull of the Trigger."**

Whereas the statute defines a "machinegun" as one that operates "by a single **function** of the trigger," the Final Rule deletes one word and replaces it with another, rewriting that phrase to be "by a single **pull** of the trigger."  To uphold that revision, the district court decided that the phrase "'single function of the trigger' ... can have more than one meaning."  Opinion, R.48, Page ID#465. The court concluded that the term could either mean the "mechanical process" — "single function of the trigger" — as the statute says and as Appellants argue, or it could mean "the external impetus for the mechanical process" — "single pull of the trigger" — as ATF claims.  *Id.*  The Court concluded that "[b]oth interpretations are reasonable," and that "ATF's interpretation finds support in *Staples*[24] while Plaintiffs' interpretation finds support in *Fleischli*."  Opinion, R.48, Page ID#466.  Appellants' interpretation also finds support in the plain text of the statute.  And the words "function" and "pull" are not synonyms, nor are they even related concepts.  *See* Reply, R.37, Page ID#290.

On the contrary, the opposite is true.  "Single function of the trigger" clearly and unambiguously refers to the mechanical process through which the trigger

---

[24]  The D.C. Circuit disagreed, finding Staples to be ambiguous, helping neither side's position.  Guedes at 30.

goes (what the firearm is doing).  The phrase clearly does not refer to the

biological process (what the shooter is doing) which sets this mechanical process

into motion.  Even ATF agreed with this conclusion up until at least 2009.  *See*

ECF 10 at 6.

Yet while deferring to ATF's "interpretation," the district court never

undertook an examination of what the statutory phrase "single function of the

trigger" actually means.[25]  Even if such deference to the agency were appropriate

— which it decidedly is not — the district court based its finding of ambiguity on

---

[25]  The U.S. District Court for the District of Utah did not clearly apply
Chevron deference, but instead decided that the Final Rule represents the "best
interpretation" of the statute.  Aposhian v. Barr, 2019 U.S. Dist. LEXIS 42988 at
\*9.  First, the court noted that "'courts have instinctively reached for the word
"pull,"'" yet that tells us very little about what Congress intended.  Second, the
court claimed that "[t]he ill sought to be captured by this definition was the ability
to drastically increase a weapon's rate of fire...."  *Id.*  There, the court falls into the
same trap as ATF — assuming it is within the purview of judges to "interpret" a
statute differently from the way it is written, in order to give effect to the
perceived "intent" of Congress.  As Appellants have explained, Congress did not
regulate a results-oriented "rate of fire" or devices that "mimic" machineguns — it
regulated firearms that fall within a **precise mechanical definition**.
Memorandum, R.10, Page ID#185; Reply, R.37, Page ID#298-99, Transcript,
R.56, Page ID#528.  Moreover, the Utah court, like the court below, never
explains how a bump stock operates by a "single pull of the trigger."  As explained
in Section II.D, *infra*, a bump stock equipped rifle operates through a series of
individual pulls of the trigger.  As for "automatically," the Utah court concluded
that "the statute ... provides [no] basis for an interpretation that restricts the degree
of shooter involvement in an automatic process."  Aposhian at \*12.  This
argument is addressed in Section II.A, *supra*.

unclear legal precedents and a lack of helpful dictionaries.  But it does not appear

that the court began with the statutory text itself, and the court certainly never

explained why the phrase "single function of the trigger" is ambiguous on its face.

Rather, both the government and the district court simply assumed that it was

permissible to substitute one word for another word in the statute — "function"

with "pull."[26]

The district court never explains why "single function of the trigger" should

be "interpreted" to mean anything other than "single function of the trigger."[27]

Indeed, the government concedes that it loses if the statute is interpreted as

---

[26]  Agencies are not free to edit statutes at will.  As the Supreme Court made
abundantly clear in 2014, "[a]n agency has no power to 'tailor' legislation to
bureaucratic policy goals by rewriting unambiguous statutory terms ... to suit its
own sense of how the statute should operate. ... [The agency's] need to rewrite [the
statute] should have alerted [it] that it had taken a wrong interpretive turn."  Utility
Air Regulatory Group v. EPA, 573 U.S. 302, 325-28 (2014).  *See also* Christensen
v. Harris County, 529 U.S. 576, 588 (2000) (an agency may not, "under the guise
of interpreting a regulation ... create *de facto* a new regulation.").

[27]  ATF here has argued that the "ordinary, accepted terminology" and the
colloquial meaning should govern, even though Congress clearly chose not to use
ordinary or colloquial terminology in the statute.  *See* ECF 37 at 5-6.  Despite the
"ubiquity of this usage" (Guedes Memorandum in Opposition at 18), Congress
chose "single function of the trigger," which indicates a "technical sense," and
describes the operation of the firearm, not the actions of the shooter.  *See* Reading
Law at 69.  If Congress had wanted the statute to mean "single pull of the trigger
by the shooter," it would have said that.

written.  *See* <u>Guedes</u> v. <u>ATF</u>, No. 18-2988 (D.D.C.), Memorandum in Opposition, ECF #16 at 33.

**C.    The Statutory Text Does Not Cover Bump Stocks, Since They Permit Only One Round to Be Fired Per "Function of the Trigger."**

No one has ever disputed Appellants' repeated assertion that a bump stock-equipped rifle fires only a single round "by a single function of the trigger."  As Appellants have explained, each time the trigger of a semiautomatic firearm is depressed and reset (one complete function of the trigger), one round is fired.  Click, bang, click.  A bump stock does not change this mechanical operation, but only facilitates the shooter making the process occur more rapidly.  Complaint, R.1, Page ID#11, Vasquez Declaration, R.7, Page ID#149, 156.  On the other hand, an actual machinegun fires a series of shots for each "function" of the trigger.  Click, bang, bang, bang, click.  Complaint, R.1, Page ID#9.  *See* Memorandum, R.10, Page ID#174.  Indeed, the D.C. Circuit acknowledged as much, noting that reading the statute as written "would tend to exclude bump-stock devices: ... a semiautomatic rifle outfitted with a bump stock ... engender[s] a rapid bumping of the trigger against the shooter's stationary finger, such that **each bullet is fired because of a distinct mechanical act of the trigger**."  <u>Guedes</u> at 29 (emphasis added).  Judge Henderson's dissent was clearer — "a bump stock

*cannot* fire more than one round with a *single* function of the trigger.... If the focus is — as it must be — on the trigger, a bump stock does not qualify as a 'machinegun.'" *Id.* at 47-48.

Absolutely no one — including the government or the court below — has disputed Appellants' claims regarding the function of the trigger. In other words, if one reads the phrase "single function of the trigger" to actually mean "single function of the trigger," then everyone agrees that bump stocks are not machineguns. Only by reading the statute to mean something different from what it clearly states can bump stocks be banned, but even then, only by ignoring the facts (*see* Section III.A, *infra*).

**D.    The District Court Erred by Failing to Expressly Conclude That — Much Less Explain How — Bump Stocks Operate even by a "Single Pull of the Trigger."**

Even if the district court were correct in concluding that "single function of the trigger" is ambiguous, and that ATF's interpretation of "single pull of the trigger" is a reasonable interpretation,[28] Appellants should still prevail, because the court below never expressly states that — much less explains how — a bump

---

[28] ATF's adoption of the "single pull" interpretation in 2006 is decidedly unreasonable, because it has proved unworkable, and the Final Rule now further revises that definition. *See* Reply, R.37, Page ID#290; Brief in Opposition, R.34, Page ID#266. Of course, the statutory phrase "single function" encompasses all of these motions, which is why Congress chose the precise statutory language it did.

stock fires even "by a single pull of the trigger." That's because bump stocks

don't fire more than one round even by a "single pull of the trigger," a fact that is

fatal to the district court's opinion.

Appellants argued that it is evident a shooter must physically touch a trigger

in order to pull it. Thus, how could the lower court possibly have concluded that a

bump stock is a machinegun, if it does not first conclude the opposite — that a

bump stock permits firing more than one round by a "single pull of the trigger"?

In reality, the court noted just the opposite in its recitation of the facts, noting that,

when using a bump stock, the recoil "separat[es] the trigger finger ... and the

trigger itself" between shots. Opinion, R.48, Page ID#459 *See also* Vasquez

Declaration, R.7, Page ID#148; Complaint, R.1, Page ID#10. Likewise the Final

Rule admits that a bump stock "permit[s] the trigger to **lose contact with the**

**finger** and manually reset." 83 *Fed. Reg.* 66517 (emphasis added). *See also*

Guedes at 49 (Henderson, J., dissenting).

In its brief below, the government made the mind-boggling assertion that a

person need not physically touch a trigger in order to pull it. *See* Reply, R.37,

Page ID#297. According to the government, the phrase "single pull of the trigger"

"places too much stock in the physical separation between trigger and finger."

Brief in Opposition, R.34, Page ID#270. Rather, as the government argued in the

34

D.C. case, the "constant exertion on the bump stock ... corresponds to constant intent by the shooter to continue to pull on the trigger...." Guedes Opposition at 24. In other words, according to the government, it doesn't matter that a shooter doesn't **actually** continue to pull the trigger; all that matters is that he **intends** to continue to pull the trigger. Of course, it was the government that mandated use of the "single pull of the trigger" language, but now claims it's not necessary to focus too closely on the fact that the trigger is not being continually pulled. This Court should decline ATF's invitation to adopt these principles, more akin to telekinesis than mechanics, into federal law.

Unsurprisingly, the district court did not adopt ATF's tortured logic. But neither did the court offer its own explanation of how the use of a bump stock could involve a "single pull of the trigger," when the trigger and trigger finger are physically separated between each and every shot.[29]

### E.  If the Definition of a Machinegun Is Suddenly Now Ambiguous, It Must Be Declared Void for Vagueness.

At oral argument on March 6, 2019, Appellants' counsel argued to the court that, if this previously unambiguous statute is now declared ambiguous, it then

---

[29] *See* animation at https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html.

should be declared void for vagueness.[30]  Transcript, R.56, Page ID#494-95, 505.

After all, it is a fundamental principle of constitutional law that criminal statutes

must clearly delineate what constitutes a crime.[31]  *See* Guedes at 42 (Henderson, J.,

dissenting).  Indeed, the Supreme Court has held that "a statute which either

forbids or requires the doing of an act in terms so vague that men of common

intelligence must necessarily guess at its meaning and differ as to its application,

violates the first essential of due process of law."  Connally v. General Constr.

Co., 269 U.S. 385, 391 (1926).  *See also* Gundy v. United States, 2019 U.S.

LEXIS 4183 (2019) (June 20, 2019) (Gorsuch, J., dissenting) at *57.  Just today,

the Court confirmed that "When Congress passes a vague law, the role of courts

under our Constitution is not to fashion a new, clearer law to take its place, but to

treat the law as a nullity and invite Congress to try again."  Davis, Slip. Op. at 1.

---

[30]  In the D.C. case, the Guedes plaintiffs argued the "rule of lenity."
Guedes at 27.  Yet "[i]f a vague or ambiguous statute is declared
void-for-vagueness, there is no need to resort to the rule of lenity."  S. Duke,
"Legality in the Second Circuit," Yale Faculty Scholarship Series 817 at 913
(1983).

[31]  *See* Sessions v. Dimaya, 138 S.Ct. 1204, 1212 (2018) ("'The prohibition
of vagueness in criminal statutes,'... is an 'essential' of due process, required by
both 'ordinary notions of fair play and the settled rules of law.' ... In that sense, the
doctrine is a corollary of the separation of powers — requiring that Congress,
rather than the executive or judicial branch, define what conduct is sanctionable
and what is not.").  *See also* United States v. Gradwell, 243 U.S. 476, 485 (1917).

If it is not the job of the courts to rewrite the law, it certainly is not the job of bureaucrats.

Appellants' briefing also discussed this issue, noting that, if the agency to date has been careless, if not reckless, in interpreting the statute, would that failure not jeopardize prior criminal convictions? Memorandum, R.10, Page ID#191. During oral argument below, the district court asked government counsel about this issue, querying as to the implications for criminal prosecutions that previously have relied on an unambiguous criminal statute. The government's answer to the district court was that the statute was not ambiguous "until this question arose," but "the final rule now lays out a clarifying definition, that is sufficient in our view to close the ambiguity...." Transcript, R.56, Page ID#508-09. In other words, there was no ambiguity before, but then the government created some to provide leeway for the Final Rule in this case, and now has conveniently returned to its original claim that the courts should go back to finding the statute unambiguous. The Final Rule apparently clarifies the ambiguity the Final Rule creates. In other words, try not to think too hard about it.

In order for the government to prevail in this case, it is necessary for this Court to conclude that the statute defining a machinegun is ambiguous. Yet for decades, courts consistently concluded that the statute is unambiguous. *See, e.g.*,

United States v. Williams, 364 F.3d 556, 558 (4th Cir. 2004); United States v.

TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006, 447 F.3d 686, 689

n. 4 (9th Cir. 2006); United States v. Olofson, 563 F.3d 652, 660 (7th Cir. 2009);

and United States v. Fleischli, 305 F.3d 643, 655 (7th Cir. 2002).  Suddenly now,

our third branch of government has begun to consistently conclude that the statute

is ambiguous.  See Guedes v. ATF, No. 18-2988 and Codrea v. ATF, No. 18-3026,

Memorandum Opinion (D.D.C).  In the future, when otherwise-law-abiding bump

stock owners inevitably are prosecuted for possession of unregistered

machineguns, will the courts flip back, and conclude that the statute is again

unambiguous to avoid the shoals of vagueness?

The district court did not wrestle with these serious issues in its opinion.

Thus, this Court must carefully consider the ramifications of the district court's

ratification of an agency declaration that a criminal statute has suddenly become

ambiguous, after 85 years of being unambiguous.

## III.  THE FINAL RULE IS ARBITRARY AND CAPRICIOUS.

As this Court has held, "[e]ven if an agency's statutory interpretation is

permissible under *Chevron* or *Skidmore*, the agency's action may still be

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'"  Atrium Med. Ctr. at 567.  The Supreme Court's recent decisions in Apel

and Abramski appear to foreclose any sort of deference to agency interpretations of criminal statutes, including APA Section 706 deference. *See* Section I.C. Nevertheless, even if this Court should reject that argument, the Final Rule represents an arbitrary and capricious decision by the agency. It is illogical, irrational, and inconsistent with the statute. It "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). In addition to the arguments already raised, here are some reasons why.

> **A.      The Final Rule Is Based on the ATF's Unsubstantiated and Erroneous Factual Assertions.**

ATF in this case seeks not only to revise the law, but also to change the facts. Indeed, the agency has sought to change the fundamental facts about how bump stocks operate. *See* Reply, R.37, Page ID#291-92 (giving at least five examples). To be sure, the district court did not explicitly adopt many of the government's new and improved "alternative facts." Yet under the test set out in

the Final Rule, there is no way to conclude that a bump stock is a machinegun

**other than to adopt** ATF's **current** recitation of the facts.  For example:

• One cannot conclude that a bump stock equipped rifle fires with a "single pull of the trigger," without rejecting ATF's 2012 explanation that the shooter of a bump stock equipped rifle "pulls the receiver assembly forward to fire **each** shot...."  Exhibit 18, R.1-19, Page ID#74-75.

• One cannot conclude that a bump stock equipped rifle fires "automatically" without rejecting ATF's 2010 conclusion that a bump stock "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function...."  Exhibit 1, R.1-2, Page ID#30.

• One cannot conclude that a bump stock "harnesses the recoil energy" of a shot without rejecting ATF's prior claim that bump stocks "'**lacked** internal springs or other mechanical parts that channeled recoil energy.'"  *See* Reply, R.37, Page ID#291.[32]

• One cannot conclude that a bump stock works "without conscious input or direction...." (Guedes Opposition at 25), without ignoring ATF's past determination that it "requires continuous multiple inputs by the user for each successive shot."  Exhibit 20, R.1-21, Page ID#79-80.

_____

[32]  Unfortunately, the district court adopted this "alternative fact," claiming that a "bump stock ... harnesses the rearward recoil energy...."  Opinion, R.48, Page ID#459.  But not even the government still believes this is true.  *See supra*.  Indeed, bump stocks are not capable of harnessing anything.  *See* Memorandum, R.10, Page ID#183-84; Reply, R.37, Page ID#294.  Rather, it is the shooter's body that absorbs the recoil energy of the firearm, and counteracts that force with biological forces.  The shooter acts as a human compression spring — replacing the mechanical springs found in early bump stocks.  Indeed, the government abandoned the Final Rule's claim that bump stocks "harness" recoil energy, and admitted the truth of Appellants' argument that bump stocks **cannot** harness energy, conceding that "humans play the primary role in absorbing and releasing the recoil energy."  Brief in Opposition, R.34, Page ID#272.  In other words, the district court adopted as fact a claim that both parties reject.

Writing in dissent in the D.C. Circuit, Judge Henderson saw through the ATF's charade. Judge Henderson noted that ATF's prior classification letters had "made *factual findings*," and "those factual findings dictate that a non-mechanical bump stock is not a 'machinegun'...." Guedes at 47.

Even if the district court were correct that it was required to defer to ATF's legal interpretation of the statute, there is no statute or decision that requires a court to adopt uncritically an agency's factual predicate for a rulemaking. Yet the court below unhesitatingly and unquestioningly adopted ATF's factual misrepresentations as to how bump stocks operate in concluding that they are machineguns under the statute. That was clear error.

The district court never so much as referenced ATF's past statements of fact, made during a time when the agency had no motivation to misrepresent the truth as to how bump stocks work. Much less did the court attempt to reconcile these prior statements with the contradictory "alternative facts" the agency presents now, manufactured at a time when the agency has every incentive to manipulate the truth in order to fulfill the President's political agenda. The court's failure to critically examine the Final Rule's unsubstantiated factual assertions constitutes clear error.

Nevertheless, Appellants presented significant evidence below as to how bump stocks operate. They provided expert witness testimony in the form of a sworn affidavit from a former ATF official whose job it was to classify bump stocks. They provided numerous exhibits, links to bump stock videos, and an explanation from counsel (based on personal experience) at oral argument, all describing how bump stocks operate. On the other hand, ATF provided nothing but unsworn and unproven assertions in the Final Rule, which are in conflict with its own past statements.

**B.     The Final Rule Is Arbitrary and Capricious.**

**1.     It Was Arbitrary and Capricious for ATF to Ban Bump Stocks But Sanction Bump Fire.**

To demonstrate how the Final Rule is arbitrary and capricious, Appellants noted that the Final Rule explicitly sanctions bump fire accomplished with a rubber band (83 *Fed. Reg.* at 66551) while banning bump fire accomplished with a bump stock. Memorandum, R.10, Page ID#186. A rubber band meets all of the criteria set forth in the Final Rule, while bump stocks meet none of those criteria. To conclude that a bump stock is a machinegun while leaving a rubber band unregulated is the very essence of an arbitrary and capricious rulemaking.

The district court responded to this argument as follows. First, the court

concluded that rubber bands cannot be machineguns under the Final Rule because

they "are not parts or devices 'designed and intended' as parts for a firearm."

Opinion, R.48, Page ID#467. The court claims that the Final Rule applies only "to

devices specially designed and marketed for the purpose of increasing the rate of

fire of a semiautomatic weapon...." *Id.* However, nowhere does the Final Rule

say this; the Final Rule uses the phrase "designed and intended" five times — all

when quoting the statute. More importantly, however, the statutory definition of a

machinegun is not limited to devices "designed and intended" to be machineguns.

The district court knew this because counsel for Appellants pointed out at oral

argument "[t]hat was the same point made at oral argument in DC, and Judge

Friedrich jumped all over that. That's because the statute does not just outlaw

things that are designed and intended. The last section of the statute says, 'any

combination of parts from which a machinegun can be assembled.'" Transcript,

R.56, Page ID#526. Indeed, counsel pointed out that "Congress used the term

'designed and intended' three other times in that statute and didn't use it in that

last section, and there is a reason for that." *Id.* at ll. 14-21 (quoting the Supreme

Court's statement that "'[Where] Congress includes particular language in one

section of a statute but omits it in another section ... it is generally presumed that

43

Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Russello v. United States, 464 U.S. 16, 23 (1983)). What's more, for decades ATF has denied that devices need to be "designed and intended" as machineguns in order to be classified as such. *See* Transcript, R.48, Page ID#467. The district court erred by concluding that rubber bands are not machineguns because they are not "designed and intended" as such, when the applicable statutory provision contains no such limiting principle.

Second, the district court concluded that a rubber band cannot be a machinegun because, "as ATF points out, rubber bands ... do not harness the recoil energy when a shot is fired."[33] Op. at 15. Here, the district court committed a logical fallacy, the "fallacy of composition" — concluding that something is true of the whole because it is true of a part. The Final Rule does not prohibit devices which "harness recoil energy"; rather, it prohibits devices that "function[] as the result of a self-acting or self-regulating mechanism...." 83 *Fed. Reg.* 66514. The Final Rule states that bump stocks fit that test because they "harness ... recoil energy." *Id.* In other words, harnessing energy is **one way** a device could be a

---

[33] This claim is not correct because, when fitted to the trigger of a rifle, the rubber band stretches when the trigger is depressed, and harnesses both that elongation and the recoil of a fired shot, which together cause the trigger to be pulled forward, resetting it.

"self-acting or self-regulating mechanism," but it is **not the only way**. If it were, then a device like the Auto Glove (which uses a battery-powered motorized trigger activator instead of harnessing recoil to operate) would not be a machinegun, even though ATF has ruled that it is. Even if a rubber band does not "harness recoil energy," that does not mean that it is not still a "self-acting or self-regulating mechanism."[34] In fact, there is no meaningful difference between an old-style bump stock like the Akins Accelerator, which harnesses the **compression** of a spring (and is illegal, according to ATF), and bump firing harnessing the **elongation** of a rubber band (which is legal, according to ATF).

Third, the district court's appeals to vague principles of reasonableness, arguing that statutes should be read "'so as to avoid unjust or an absurd conclusion.'" Opinion, R.48, Page ID#468 (citing *In Re Chapman*, 166 U.S. 677, 680 (1897)). The district court did not mention that the agency whose judgment it trusts has, in the past, twice absurdly concluded that a shoestring — by itself — was a machinegun.[35] The unjust and absurd conclusion here is that bump stocks are machineguns.

---

[34] https://www.youtube.com/watch?v=PVfwFP_RwTQ.

[35] https://www.everydaynodaysoff.com/wp-content/uploads/2010/01/ATF-shoestring-machine-gun-2004.jpg.

### 2.    The Final Rule Poses a Threat to Semiautomatic Weapons As a Class.

If bump stocks are machineguns, then all semiautomatic firearms could be classified improperly as machineguns.  As Appellants have explained, a future ATF could argue that all semiautomatic firearms are machineguns because, like rubber bands, they arguably meet all the elements of the test set forth in the Final Rule.  Memorandum, R.10, Page ID#187-88.  Judge Henderson recognized the same problem, writing that the Final Rule fails to "maintain[] the longstanding distinction between 'automatic' and 'semiautomatic' in the firearms context." Guedes at 44-45.

The district court, however, rejected Appellants' argument and claimed that "Plaintiffs have advanced a 'slippery slope,' a logical fallacy that avoids the question presented and shifts to a more extreme hypothetical."  Opinion, R.48, Page ID#467.  In fact, what the district court calls a "slippery slope" is already reality, since the Final Rule has already declared some semiautomatic firearms to be machineguns, repeatedly claiming that bump stocks "convert an otherwise semiautomatic firearm into a machinegun."  83 *Fed. Reg.* 66514.

What's more, "[s]lippery slope arguments can be good ones if the slope is real — that is, if there is good evidence that the consequences of the initial action

are highly likely to occur.  The strength of the argument depends on two factors. The first is the strength of each link in the causal chain.... The second is the number of links."  D. Kelley, <u>The Art of Reasoning: An Introduction to Logic & Critical Thinking</u> (W.W. Norton & Company; Fourth Ed. (Oct. 2013)), p. 123.

In this so-called slippery slope, there is but one link:  if the Final Rule's "expanded" definition of machinegun is accepted, the government next could argue that semiautomatic firearms meet each of ATF's new elements for what constitutes a machinegun.  *See* Memorandum, R.10, Page ID#188.  Indeed, the primary way to distinguish between semiautomatic and fully automatic firearms is by how their triggers function.

Although reasonable minds can disagree as to how likely it is that ATF one day would attempt to classify semiautomatics as machineguns, it certainly is not fallacious reasoning.  The district court erred by so casually dismissing Appellants' concern about the logical implications of the Final Rule.  This Court should correct that error.

## IV. APPELLANTS ALSO MEET THE REMAINING CRITERIA FOR A PRELIMINARY INJUNCTION.

The district court noted that "Defendants concede that Plaintiffs will suffer irreparable harm without an injunction." Opinion, R.48, Page ID#469. Thus, the second criterion for a preliminary injunction clearly weighs in Appellants' favor.

With respect to the third and fourth elements, which "merge when the government is the opposing party," first, Appellants have repeatedly stressed the fact that the government offered no evidence that bump stocks have ever been used in any crime, including the Las Vegas shooting. Reply, R.37, Page ID#299; Transcript, R.56, Page ID#543-44. Second, Appellants argued that the government offered no conceivable explanation about how banning bump stocks may prevent future crime, especially when all sorts of other devices, techniques, and firearms remain on the market, offering identical (if not more effective) results. Transcript, R.56, Page ID#544-45. Third, Appellants noted that "[i]t is in the public interest for ... an agency to implement properly the statute it administers." Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 45 (D.D.C. 2000).

Even when repeatedly challenged to provide any evidence that bump stocks actually were used in the Las Vegas shooting, which was the asserted impetus for

the Final Rule, the government failed to do so.  (The district court stated only that the Las Vegas "gunman **reportedly** employed bump-stock devices...."  Opinion, R.48, Page ID#458 (emphasis added).)  Rather than engage Appellants on this point, the government went after a straw man, accusing Appellants of making a "baseless assertion" that bump stocks in fact were not used.[36]  Opposition to Petition for Mandamus, Docket No. 19-1268, Doc. #10 at 20.  Of course, Appellants have never alleged that bump stocks were not used in Las Vegas; they have merely noted that the government **has provided no evidence** that bump stocks were used.  Indeed, just last month, in responding to a Freedom of Information Act request for "any records documenting the use of a bump-fire type stock ... during the commission of any crime to date," the ATF responded that it "found no responsive records."  ATF letter to Stephen D. Stamboulieh, FOIA Request # 2018-0816, dated May 1, 2019.[37]  Since the government has not

---

[36]  In fact, Appellants' counsel said precisely the opposite: "I'm not saying it's not true, I'm just saying it is an unproven assertion that these things were used in Las Vegas...."  Transcript, R.56, Page ID#544.

[37]  https://www.ar15.com/media/mediaFiles/169738/file-9_jpeg-930563.JPG

presented any **evidence** that bump stocks have been used in crime, this Court

cannot simply assume that bump stocks pose a serious threat to public safety.[38]

Next, the government has been entirely unable to show any likelihood that

bump stocks pose any future threat to public safety. In fact, Appellees' only

contention was generic, nonspecific, and unsubstantiated allegations that "a

terrorist or criminal [could] use a lawfully-possessed bump stock to carry out a

large-scale attack," and that police officers will start falling in the streets if bump

stocks continue to be lawful. Brief in Opposition, R.34, Page ID#279-280. To be

sure, the district court was quick to fill in the gaps on the purported evils of bump

stocks, asserting that machineguns pose a threat to public safety and "[r]estrictions

on bump stocks advance the same interest. **All of the public is at risk**...."[39]

---

[38] Moreover, as Appellants have explained, even if bump stocks were used in the Las Vegas shooting, the results of that tragedy may not have been any different if bump stocks had never existed. The shooter reportedly had vast financial resources and a clean criminal record, meaning he could have purchased legally any firearms he wished, including fully automatic weapons. Transcript, R.56, Page ID#545.

[39] The district court appears to believe, as the government does, that because a rifle with a bump stock might **appear** to operate as a machinegun, that is enough that it be classified **as** one. *See also* district court's reference to "rapid-fire weapons" rather than machineguns at Opinion, R.48, Page ID#456. But again, Congress did not regulate a "rate of fire" in the NFA, nor did it regulate items which help a shooter achieve a faster speed of fire than without them. *See* fn. 25, *supra*. Indeed, there were many such devices available at the time the NFA was enacted, such as the Gatling Gun (which uses multiple barrels rotating around a

50

Opinion, R.48, Page ID#469 (emphasis added).  But neither the government nor the district court pointed to any actual evidence that this is true.  At oral argument, government counsel claimed that even though "there may not have been a number of violent acts committed with bump stocks, ... ATF, in its expertise, thinks that these are dangerous."  Transcript, R.56, Page ID#546.  In other words, "just trust us."  On the contrary, no one has even explained how a three hundred dollar bump stock poses a greater or different threat to public safety than a three-cent rubber band.

Finally, the government countered Appellants' quotation that "it is in the public interest for ... an agency to implement properly the statute it administers" with a case that says "the public interest is in implementing congressional priorities."  Brief in Opposition, R.34, Page ID#281.  The district court rejected Appellants' claim as "overlap[ping] entirely with the merits of Plaintiffs' claim" (the district court does not further elaborate on this curious assertion) but

---

central axis and is capable of a rapid rate of fire, https://www.youtube.com/watch?v=FtrX9vKPqtg), muzzle brakes (which keep the barrel flat for faster follow-up shots), high capacity magazines (some up to at least 100 rounds in that era), and belt-fed firearms (that had virtually unlimited capacity).  None of these devices was regulated under the NFA.  Rather, Congress regulated weapons which **mechanically** are machineguns **based on how they function, not how they appear**.  This represents a **narrow class** of weapons — one that does not include every device that results in the ability of a shooter to fire rapidly.

ironically, did not similarly malign Appellants' nearly identical claim.  Opinion,

R.48, Page ID#470.  Moreover, an agency is not free to "implement" alleged and

perceived "congressional priorities" if doing so conflicts with the plain text of the

statute Congress actually enacted.  *See* Reading Law at 343-46, 397-98.

## CONCLUSION

Many federal judges hold a dim view of the rights protected by the Second

Amendment.  Appellants understand that.  As a result, the Second Amendment has

been relegated by some courts to the status of a second-class right.  *See* Friedman

v. City of Highland Park, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from

denial of certiorari).  Appellants get it.  But this case involves even more than the

Second Amendment.  Its implications are wider reaching than a politically

unpopular firearm accessory.  Rather, the powers claimed by the agency in this

case "threatens a complete undermining of the Constitution's separation of

powers."  This case has affected the owners of over a half million bump stocks and

over $100 million of lawfully owned property.  But that is just the tip of the

iceberg as to why this case is important.

Here, an agency has blatantly admitted that it is rewriting a federal statute to

fulfill the political agenda of the executive branch.  It has admitted that it cannot

achieve the result it wants under the current law, and so it must be permitted to

52

change the law.  And it has asked the courts to go along with it.  But when administrative agencies wield the unchecked powers of all three branches of government, the rule of law is undermined, and the most critical limiting principle to our republican form of government — the separation of powers — is eroded.

Only a few days ago, Justice Gorsuch wrote that "[t]he Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty." Gundy, Slip. Op. at 24 (Gorsuch, J., dissenting).  Yet here, ATF admits that it has "expanded" the statute to include bump stocks, on the theory that is what a 1934 Congress would have wanted.  But as Justice Gorsuch warns, "the ... federal government's most dangerous power [is] the power to enact laws restricting the people's liberty." *Id.* at 29.  That is the power that ATF has exercised in this case.  The Constitution's careful balance, Justice Gorsuch explains, "was also designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules." *Id.* at 31.  Yet here, ATF for years told gun owners that bump stocks were unregulated firearm accessories, only to change that "interpretation" based on naked political agenda.  Justice Gorsuch also notes that the "Constitution sought to ensure that the lines of accountability would be clear...." *Id.*  Yet here, gun owners cannot vote

from office, impeach, or remove the nameless, faceless ATF bureaucrats who have arbitrarily declared them felons.

What Judge Henderson in dissent in D.C. called the "old-fashioned route," Justice Gorsuch called a constitutional mandate to the judiciary: "the Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed." <u>Guedes</u> at 32. The district court's fundamental duty was to determine the meaning of this statute — not to abdicate that duty to bureaucrats.

For the reasons stated above, the district court's decision below, denying Appellants' Motion for a Preliminary Injunction, should be reversed, and a preliminary injunction should issue, enjoining Appellees from enforcing the Final Rule.

Respectfully submitted,

/s/ Robert J. Olson

KERRY L. MORGAN
  PENTIUK, COUVREUR & KOBILJAK, P.C.
  2915 Biddle Avenue, Suite 200
  Wyandotte, Michigan 48192
  (734) 281-7100

ROBERT J. OLSON*
JEREMIAH L. MORGAN
WILLIAM J. OLSON
HERBERT W. TITUS
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
Counsel for Appellants
*Attorney of Record

# CERTIFICATE OF COMPLIANCE

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief for Appellants complies with the type-volume limitation of Rule 32(a)(7)(B)(i), Federal Rules of Appellate Procedure, because this brief contains 12,949 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 18.0.0.200 in 14-point Times New Roman.

<br>

        /s/ Robert J. Olson
        Robert J. Olson
        Counsel for Appellants

        Dated:  June 24, 2019

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief for

Appellants was made, this 24th day of June 2019, by the Court's Case

Management/Electronic Case Files system upon all parties or their counsel of

record.

 /s/ Robert J. Olson
Robert J. Olson
Counsel for Appellants

# ADDENDUM

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

| Docket # | Document | Page ID # |
|---|---|---|
| 1 | Complaint | 1-28 |
| 9 | Motion for Preliminary Injunction | 163-165 |
| 10 | Brief in Support of Motion for Preliminary Injunction | 166-197 |
| 34 | Gov't Brief in Opposition | 253-283 |
| 37 | Reply Brief | 286-300 |
| 38 | Gov't Notice of Supplemental Authority | 301-302 |
| 48 | Opinion and Order | 453-470 |
| 49 | Notice of Appeal | 471 |
| 56 | Transcript of Hearing | 490-549 |