No. 19-1298

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

GUN OWNERS OF AMERICA, INC., et al.

Plaintiffs-Appellants,

GUN OWNERS OF CALIFORNIA, INC.,

Movant,

v.

MERRICK B. GARLAND, et al.

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Western District of Michigan

_____

## PETITION FOR REHEARING EN BANC

_____

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

ANDREW BIRGE
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
BRAD HINSHELWOOD
KYLE T. EDWARDS
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*(202) 514-7823*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ................................................................................1

BACKGROUND ...........................................................................................................3

REASONS WHY THE PETITION SHOULD BE GRANTED ..................................7

CONCLUSION ......................................................................................................... 15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                     **Page(s)**

*Akins v. United States*:
   No. 8:08-cv-988, slip op. (M.D. Fla. Sept. 23, 2008) ......................................................5
   312 F. App'x 197 (11th Cir. 2009) ............................................................ 2, 6, 9, 10, 13

*Aposhian v. Barr*:
   374 F. Supp. 3d 1145 (D. Utah 2019) ......................................................................12
   958 F.3d 969 (10th Cir. 2020), *vacated on reh'g*,
   973 F.3d 1151 (10th Cir. 2020), *reinstated*,
   989 F.3d 890 (10th Cir. 2021) ..................................................................... 2, 10, 14

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
   515 U.S. 687 (1995) ..............................................................................................14

*County of Maui v. Hawaii Wildlife Fund*,
   140 S. Ct. 1462 (2020) ..........................................................................................14

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019), *cert. denied*,
   140 S. Ct. 789 (2020) ................................................................................. 2, 10, 14

*United States v. Camp*,
   343 F.3d 743 (5th Cir. 2003) ................................................................................11

*United States v. Evans*,
   978 F.2d 1112 (9th Cir. 1992) ......................................................................... 8, 11

*United States v. Fleischli*,
   305 F.3d 643 (7th Cir. 2002) ................................................................................11

*United States v. Jokel*,
   969 F.2d 132 (5th Cir. 1992) ................................................................................11

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ..............................................................................................14

*United States v. Olofson*,
   563 F.3d 652 (7th Cir. 2009) ..................................................................................8

**Statutes:**

18 U.S.C. § 926(a) ................................................................................4

26 U.S.C. ch. 53 ..................................................................................3

26 U.S.C. § 5845(b) ................................................... 1, 4, 7, 8, 11

26 U.S.C. § 7805(a) ..............................................................................4

**Regulation:**

28 C.F.R. § 0.130 ................................................................................4

**Legislative Materials:**

H.R. 9741, 73d Cong. (1934) ............................................................9

H.R. Rep. No. 73-1780 (1934) ....................................................... 3, 9

H.R. Rep. No. 99-495 (1986), *reprinted in*
    1986 U.S.C.C.A.N. 1327 ............................................................4

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on*
    *Ways & Means*, 73d Cong. (1934) ..............................................10

S. Rep. No. 73-1444 (1934) ..............................................................9

**Other Authorities:**

ATF, ATF Ruling 2006-2, *Classification of Devices Exclusively Designed*
    *to Increase the Rate of Fire of a Semiautomatic Firearm* (Dec. 13, 2006),
    https://go.usa.gov/xHd89 ...........................................................6

*Automatically:*
    *Oxford English Dictionary* (1933) ...............................................12
    *Webster's New International Dictionary* (2d ed. 1934) ...................12

83 Fed. Reg. 66,514 (Dec. 26, 2018) .....................1, 4, 5, 6, 7, 12, 13

## INTRODUCTION AND SUMMARY

Pursuant to Rules 35 and 40 of the Federal Rules of Appellate Procedure, defendants-appellees Merrick B. Garland, et al., respectfully seek rehearing of this case to resolve a question of exceptional importance regarding the application of the statutory ban on machineguns to "bump stock" devices that, when attached to a semiautomatic rifle, enable a shooter to fire hundreds of rounds per minute with a single pull of the trigger.

Congress has banned possession of a machinegun in most circumstances, which it has defined as a weapon that can shoot "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Manufacturers have created various devices that permit rifles to mimic continuous machinegun fire, while attempting to construct them in ways that they hope will take the devices outside the scope of the statute. The bump stocks at issue here are such devices. It is uncontroverted that these devices permit a shooter to fire hundreds of rounds per minute with a single pull of the trigger and have been expressly designed to "permit shooters to use semiautomatic rifles to replicate automatic fire." 83 Fed. Reg. 66,514, 66,515-16 (Dec. 26, 2018). The tragic use to which such weapons may be put was demonstrated in 2017 by a lone gunman in Las Vegas, Nevada, armed with bump stock-equipped rifles who killed 58 people and wounded 500 more.

The panel nevertheless concluded that a bump stock is not a machinegun because the trigger automatically resets during the continuous firing initiated by a

single action by the shooter.  The decision invalidates a 2018 rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that addressed the proper classification of bump stocks that do not include an internal spring mechanism as machineguns, a holding that conflicts with decisions of the D.C. Circuit and the Tenth Circuit that have upheld the rule.  *See Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 789 (2020); *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020), *vacated on reh'g*, 973 F.3d 1151 (10th Cir. 2020), *reinstated*, 989 F.3d 890 (10th Cir. 2021).

The decision sweeps more broadly even than the devices directly at issue, however, and would legalize devices long recognized to be machineguns.  The majority acknowledged that, if the statutory ban on machineguns was concerned with what it described as "the human process" of firing a weapon, then the definition would encompass a bump stock "because the firearm shoots multiple shots despite the shooter's pulling the trigger only once."  Op. 30.  The panel believed, however, that it was immaterial that the device successfully recreates the firing of a machinegun; it reasoned that because the trigger continually resets during the firing, the weapon does not shoot "by a single function of the trigger."  That view was rejected by ATF long before the 2018 rule, and the panel's decision directly conflicts with the Eleventh Circuit's conclusion on bump stocks that in this respect operate identically to the devices at issue here.  *See Akins v. United States*, 312 F. App'x 197, 200, 201 (11th Cir. 2009) (per curiam).

2

The greater part of the majority opinion concerns not the nature of the weapon at issue but the reasons why it believed ATF's views should not receive *Chevron* deference.  Judge White's dissent, which would have upheld ATF's classification as a reasonable interpretation of the statute, noted several important errors in the majority's *Chevron* analysis.  In particular, the panel's conclusion that an agency's construction of a statute carrying potential criminal consequences may never receive *Chevron* deference conflicts with multiple Supreme Court decisions.  The critical question, however, is not whether ATF's classification of bump stocks should receive *Chevron* deference, but whether it is the best reading of the statute.  As we have urged, the text, history, and purpose of the statute make clear that because a firearm equipped with a bump stock "shoots multiple shots despite the shooter's pulling the trigger only once," it is properly classified as a machinegun.  That construction of the statutory text renders unnecessary the panel's sweeping decision on *Chevron* deference.

## BACKGROUND

**1.**  Congress first addressed machineguns in the National Firearms Act of 1934, 26 U.S.C. ch. 53, the first major act regulating firearms, reflecting the recognition that "there is no reason why anyone except a law officer should have a machine gun" and that "[t]he gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."  H.R. Rep. No. 73-1780, at 1 (1934).

The Act, in its present form, defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more

3

than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also encompasses parts that can be used to "convert[] a weapon into a machinegun." *Id.*

In 1986, Congress generally barred the sale and possession of new machineguns. *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing the machinegun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns").

Congress has vested in the Attorney General the authority to prescribe rules and regulations to enforce the National Firearms Act and other legislation regulating firearms, 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a), and the Attorney General has delegated that responsibility to ATF, a bureau within the Department of Justice. 28 C.F.R. § 0.130.

**2.** "Bump stocks" are devices that permit a shooter to fire hundreds of rounds per minute with a single pull of the trigger. 83 Fed. Reg. at 66,515-16. A bump stock replaces the standard stationary stock on an ordinary semiautomatic rifle—the part of the weapon that typically rests against the shooter's shoulder. It is composed of a sliding stock attached to a grip fitted with an "extension ledge" where the shooter rests his trigger finger while shooting the firearm. *Id.* at 66,516. With a single pull of the trigger, the bump stock "harnesses and directs the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping'

4

the shooter's stationary finger without additional physical manipulation of the trigger by the shooter."  *Id.*

ATF first addressed bump stock devices in 2002, when it received a classification request for the "Akins Accelerator."  83 Fed. Reg. at 66,517.  (ATF encourages manufacturers to submit novel weapons or devices to ATF for classification regarding their status under the National Firearms Act.)  The Akins Accelerator, which attached to a standard semiautomatic rifle, used a spring to harness the recoil energy of each shot, causing "the firearm to cycle back and forth, impacting the trigger finger" repeatedly after the first pull of the trigger.  *Id.*  Thus, by pulling the trigger once, the shooter "initiated an automatic firing sequence" that was advertised as firing "approximately 650 rounds per minute."  *Id.*  After first concluding that the repeated impact on the trigger finger took the device outside the scope of the statute, ATF concluded that "the phrase 'single function of the trigger'" should be understood to include "a 'single pull of the trigger,'" explaining that the Akins Accelerator created "a weapon that '[with] a single pull of the trigger initiates an automatic firing cycle that continues until the [shooter's] finger is released, the weapon malfunctions, or the ammunition supply is exhausted.'"  *Id.* (quoting *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008)).  ATF also published a public ruling announcing its interpretation of "single function of the trigger," in which it reviewed the National Firearms Act and its legislative history and explained that the phrase denoted a "single pull of the trigger."  ATF, ATF Ruling 2006-2, *Classification of Devices*

5

*Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm* (Dec. 13, 2006).[1]
The Eleventh Circuit sustained ATF's determination, explaining that interpreting
"single function of the trigger" as "'single pull of the trigger' is consonant with the
statute and its legislative history." *Akins*, 312 F. App'x at 200.  It also rejected a
vagueness challenge to the statute because "[t]he plain language of the statute defines
a machinegun as any part or device that allows a gunman to pull the trigger once and
thereby discharge the firearm repeatedly." *Id.* at 201.

**3.**  In 2018, ATF issued the interpretive rule at issue here, addressing the
question whether a bump stock is properly classified as a machinegun when its
operating mechanism does not include an internal spring such as that used in the
Akins Accelerator.  The notice of proposed rulemaking elicited over 186,000
comments, *see* 83 Fed. Reg. at 66,519, and in the final rule, ATF concluded that
inclusion of an internal spring is not determinative of a bump stock's status.  The
agency explained that after a single pull of the trigger of a weapon equipped with a
bump stock, the shooter's trigger finger remains stationary on the extension ledge as
the shooter applies constant forward pressure with the non-trigger hand on the barrel-
shroud or the fore-grip of the rifle, parts at the front of the firearm.  The bump stock
then directs the firearm's recoil energy into a continuous backwards-and-forwards
cycle without "the need for the shooter to manually capture, harness, or otherwise

---

[1] Available at https://go.usa.gov/xHd89.

utilize this energy to fire additional rounds." *Id.* at 66,532.  A bump stock thus constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a single pull of the trigger and, consequently, converts a semiautomatic rifle into a machinegun.  *Id.* at 66,532; *see also id.* at 66,514, 66,518.

Various plaintiffs subsequently brought suits challenging the rule, including plaintiff in this suit. The district court upheld the regulation, and a divided panel reversed.

### REASONS WHY THE PETITION SHOULD BE GRANTED

It is undisputed that bump stocks enable a shooter to fire hundreds of rounds a minute with a single movement of the trigger, and their deadly potential has been tragically demonstrated.  The panel majority's legalization of these weapons presents an issue of exceptional importance, and its decision conflicts with decisions of several other circuits.

**1.**  A machinegun is a weapon that can shoot "automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The panel framed the interpretive question presented as "whether 'function' is referring to the mechanical process (*i.e.*, the act of the trigger's being depressed, released, and reset) or the human process (*i.e.*, the shooter's pulling, or otherwise acting upon, the trigger)."  Op. 30.  The panel acknowledged that if the statute were concerned with what it described as "the human process," the definition would encompass a bump stock "because the firearm shoots multiple shots despite

7

the shooter's pulling the trigger only once." *Id.* The court declared, however, that the statute is concerned solely with what it described as "the mechanical process" and that a bump stock did fall within its understanding of the definition because it is "not capable of firing more than one shot for each depressed-released-reset cycle the trigger completes." *Id.*; *accord* Op. 34 ("'[T]he single function of the trigger' refers to the mechanical process of the trigger, not the shooter's pulling of the trigger.").

The panel misinterpreted the statutory text. The question under the statute is whether "a single function of the trigger" causes the weapon to shoot "automatically more than one shot." 26 U.S.C. § 5845(b). That is the case here: the shooter's initial pull on the trigger initiates an automatic fire-recoil-fire sequence that continues until the shooter stops the process or runs out of ammunition. The specific mechanical process that the trigger goes through after that initial function is not determinative; the statute instead looks to the "action that enables the weapon to 'shoot . . . automatically . . . without manual reloading,' not the 'trigger' mechanism." *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992); *accord United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (noting that "a single function of the trigger" "set[s] in motion" the automatic firing of more than one shot). As the Eleventh Circuit explained in rejecting a challenge to ATF's reclassification of the Akins Accelerator, "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins*, 312 F. App'x at 201.

The panel's dichotomy between a "human process" and a "mechanical process" is therefore illusory.  The mechanical process enables the shooter to fire hundreds of rounds a minute with a single pull of the trigger.  The question is which aspect of the mechanical process the statute is concerned with.  The "function of the trigger" that concerned Congress was the function that permits continuous firing with a single pull of the trigger, not the movement of the trigger during the continuous firing, which has no significant bearing on the deadliness of the weapon.

The legislative history of the National Firearms Act confirms that the focus of congressional concern was with devices that enabled a shooter to initiate a firing sequence with a single action rather than on subsequent movements of the trigger not initiated by additional motions of the shooter.  The report of the House Committee on Ways and Means that accompanied the bill that ultimately became the National Firearms Act, *see* H.R. 9741, 73d Cong. (1934), stated that the bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  H.R. Rep. No. 73-1780, at 2; *see* S. Rep. No. 73-1444 (1934) (reprinting the House's "detailed explanation" of the provisions, including the quoted language).  Similarly, the then-president of the National Rifle Association proposed that a machinegun should be defined as a weapon "which shoots automatically more than one shot without manual reloading, by a single function of the trigger."  *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 40 (1934) (statement of Karl T. Frederick,

9

President, National Rifle Association of America). Thus, any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," while "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." *Id.*

2. ATF had set out this understanding of "single function of the trigger" well before the 2018 rulemaking, and it had been sustained by the Eleventh Circuit, which concluded interpreting "single function of the trigger" as "'single pull of the trigger' is consonant with the statute and its legislative history" and the "plain language of the statute." *Akins*, 312 F. App'x at 200, 201. The 2018 rulemaking addressed the narrower question of whether bump stocks that did not operate with the same internal springs included in the Akins Accelerator are also properly classified as machineguns.

As noted, the D.C. Circuit and Tenth Circuit have upheld that rule in decisions that conflict with the panel's decision here. *See Guedes*, 920 F.3d 1; *Aposhian*, 958 F.3d 969. But the panel majority's mistaken reliance on what it deemed the "mechanical process," rather than the "human process," puts its decision in conflict with those of other courts to consider the definition of machinegun, including the Eleventh Circuit's decision in *Akins.* The panel's reasoning is likewise difficult to square with *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), in which the Fifth Circuit considered a rifle that had been modified with a switch-activated, motorized fishing

10

reel placed within the trigger guard.  As a result, whenever a shooter operated the switch, the reel would rotate and "that rotation caused the original trigger to function in rapid succession."  *Id.* at 744.  Because the shooter needed to perform only "one action—pulling the switch he installed—to fire multiple shots," the court held that the rifle was a "machinegun" that fired more than one shot "by a *single* function of the trigger."  *Id.* at 745 (quoting 26 U.S.C. § 5845(b)).

Courts have also uniformly rejected attempts to evade the scope of the statute by dispensing with a traditional trigger altogether, recognizing that the critical question is whether a single action can initiate a firing sequence.  In *United States v. Fleischli*, 305 F.3d 643 (7th Cir. 2002), for example, the defendant activated his firearm with an electronic on-off switch rather than a more traditional mechanical trigger.  The Seventh Circuit "join[ed] our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence."  *Id.* at 655 (citing *United States v. Jokel,* 969 F.2d 132, 135 (5th Cir. 1992) (per curiam), and *Evans,* 978 F.2d at 1113-14 n.2).  The court observed that "Fleischli's definition 'would lead to the absurd result of enabling persons to avoid the [National Firearms Act] simply by using weapons that employ a button or switch mechanism for firing.'"  *Id.* (quoting *Evans,* 978 F.2d at 1113-14 n.2).  Similarly, under the reasoning of the panel majority here, a shooter could evade the statute and initiate continuous firing with a single action as long as the device caused the weapon's trigger to move in rapid succession.

11

**3.** The reasoning of the panel majority not only would legalize the Akins Accelerator, but calls into question the classification of a variety of other devices that ATF described in the 2018 rule. *See* 83 Fed. Reg. at 66,517-18, 66,518 n.4. For example, in 2016, ATF classified "LV-15 Trigger Reset Devices" as machinegun parts. *Id.* at 66,518 n.4; *see* Gov't Br., Add. 11-21 (full classification letter). These devices attached to an AR-15 rifle and used a battery-operated "piston that projected forward through the lower rear portion of the trigger guard" to push the trigger forward, enabling the shooter to pull the trigger once and "initiate and maintain a firing sequence" by continuing the pressure while the piston rapidly reset the trigger. 83 Fed. Reg. 66,518 n.4. ATF applied the same reasoning in classifying another device— a "positive reset trigger"—that used the recoil energy of each shot to push the shooter's trigger finger forward. *See id.*; Gov't Br., Add. 5-10.[2]

---

[2] In light of its holding with respect to "single function of the trigger," the panel did not reach the question of whether bump stocks fire "automatically." Op. 35. The definition of "automatically" in the 2018 rule "is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the [National Firearms Act]'s enactment." *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1152 (D. Utah 2019). "'[A]utomatically' is the adverbial form of 'automatic,' meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation.'" 83 Fed. Reg. at 66,519 (quoting *Webster's New International Dictionary* 187 (2d ed. 1934); citing *Oxford English Dictionary* 574 (1933) (defining "automatic" as "[s]elf-acting under conditions fixed for it, going of itself")). Thus, a weapon fires "automatically" when it fires "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds." *Id.* at 66,554. The entire point of a bump stock is to permit a rifle to fire "automatically." It "performs a required act at a predetermined point" in the firing sequence by "directing the recoil energy of the discharged rounds into the space created by the sliding stock," ensuring that the rifle

12

4.  The panel majority disregarded the history of decisions rejecting attempts to evade the ban on machineguns, including the decisions directly in conflict with its own reasoning.  It acknowledged *Akins* only in passing.  But even that acknowledgement misinterpreted that decision as involving only "arbitrary-and-capricious" review, Op. 31 n.7, overlooking entirely the Eleventh Circuit's holding in rejecting a constitutional claim that "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly," *Akins*, 312 F. App'x at 201.  And it did not consider the impact of its reasoning on devices long held to be machineguns.  Nor did it explain why Congress would have intended a classification to turn not on the fact that a mechanism permits a shooter to instigate automatic fire with a single pull of the trigger, but on whether the trigger moves during the automatic firing.

5.  Before adopting its incorrect construction of the statutory text, the panel engaged in a far-reaching analysis about *Chevron* deference, concluding that "*Chevron* deference categorically does not apply to the judicial interpretation of statutes that criminalize conduct, i.e., that impose criminal penalties."  Op. 9.  That conclusion cannot be squared with the Supreme Court's decisions in, for example, *United States v. O'Hagan*, 521 U.S. 642 (1997), and *Babbitt v. Sweet Home Chapter of Communities for a*

---

moves in a "constrained linear rearward and forward path[]" to enable continuous fire.  *Id.* at 66,519, 66,532.

*Great Oregon*, 515 U.S. 687 (1995). *See* Op. 43-50 (White, J., dissenting). And, as the panel acknowledged, that conclusion splits from decisions of the D.C. and Tenth Circuits. Op. 17; *see Guedes*, 920 F.3d 1; *Aposhian*, 958 F.3d 969. But although the government disagrees with the breadth of the panel's *Chevron* decision, it is unnecessary to grant *Chevron* deference to uphold the 2018 rule. If the full court were to grant rehearing and adopt the government's approach, it could decide this case on the plain or best meaning of the statute—without needing to adopt a sweeping rule about *Chevron* deference that conflicts with Supreme Court guidance and with the decisions of other courts of appeals.

At a minimum, what should be undisputed is that a court may properly gather wisdom from the analyses of sister courts, as well as from an agency charged with implementing a statute, particularly when it has done so in a formal process that involved receipt of close to 200,000 comments. And, as the Supreme Court has explained, even when *Chevron* deference is inapplicable, "we often pay particular attention to an agency's views in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need." *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020). A court can properly consider the extent to which its interpretation of a term it believes to be ambiguous is consonant with a statute's purpose—in this case to protect the safety of the public and law enforcement officers.

14

The panel majority took wisdom from none of these sources, and its decision, which conflicts with those of sister circuits, presents an issue of exceptional importance that warrants review by the full Court.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for rehearing en banc.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

ANDREW BIRGE
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

  *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KYLE T. EDWARDS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

May 2021

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,825 words. This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, I electronically filed the foregoing

petition with the Clerk of the Court for the United States Court of Appeals for the

Sixth Circuit by using the appellate CM/ECF system.  Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood